```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
NORTH AMERICAN OLIVE OIL ASSOCATION, :
                                     :    13 Civ. 868 (JSR)
     Plaintiff,                      :
                                     :    OPINION AND ORDER
                                     :
     -v-                             :
                                     :
KANGADIS FOOD INC. d/b/a THE GOURMET :
FACTORY,                             :
                                     :
     Defendant.                      :
------------------------------------x
```



JED S. RAKOFF, U.S.D.J.

  Plaintiff North American Olive Oil Association ("NAOOA") brings this action against defendant Kangadis Food Inc., doing business as The Gourmet Factory ("Kangadis"), asserting claims for false advertising under the Lanham Act and for deceptive acts and practices and false advertising under New York General Business Law §§ 349 and 350. Plaintiff alleges that Kangadis has falsely and deceptively marketed a product as "100% Pure Olive Oil" when in fact it contains Pomace, an industrially processed oil produced from olive pits, skins, and pulp. Plaintiff has moved for a preliminary injunction. In response to that motion, Kangadis represents that all tins of its "100% Pure Olive Oil" product packed after March 1, 2013 contain no Pomace and instead are 100% refined olive oil.

  After oral argument and on consent of the parties, the Court on April 12, 2013 preliminarily enjoined Kangadis (1) from selling as "100% Pure Olive Oil" any product containing Pomace, and (2) from selling any product containing Pomace without expressly labeling it

1

as such. The Court reserved decision and invited supplemental briefing, however, on several remaining disputed issues relating to plaintiff's motion. On April 19, 2013, the Court resolved those remaining issues as follows: the Court (1) declined to extend the injunction to enjoin Kangadis from selling 100% refined olive oil as "100% Pure Olive Oil," (2) ordered Kangadis to take certain steps to inform potential consumers that tins of "100% Pure Olive Oil" packed before March 1, 2013 contain Pomace, (3) declined to order Kangadis to provide notice of its past mislabeling through its website, and (4) ordered NAOOA to post a $10,000 bond not later than April 24, 2013. This Opinion explains the reasons for those rulings.

The basic facts are not in dispute, at least not for purposes of the preliminary injunction motion. Kangadis is a food import and distribution company formed in 2003. Affidavit of Themis Kangadis in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Kangadis Aff.") ¶ 4. For the past six years, Kangadis has sold, under the brand name Capatriti, a product labeled as "100% Pure Olive Oil." Id. ¶¶ 5-7. The popularity of this product has grown over time, and it now occupies about fifteen percent of the market. Id. ¶ 7.

NAOOA, a trade association representing the interests of the olive oil industry, has produced an expert report from Professor Lanfranco Conte concluding that three samples of Kangadis's product procured in August 2012 in fact contain significant quantities of Pomace. See Expert Report of Prof. Lanfranco Conte ("Conte Report"), ex. A to Decl. of Timothy J. Treanor in Supp. of Pl.'s

2

Mot. for Prelim. Inj. ("Treanor Decl.") ¶¶ 67-70; Decl. of Ulysees Quiambao in Supp. of Pl.'s Mot. for Prelim. Inj.; Decl. of Brian Dougherty in Supp. of Pl.'s Mot. for Prelim. Inj.

Prof. Conte explains that the substance commonly known as "olive oil" comes from olives that are harvested, quickly carried to a mill, washed, crushed, and spun to separate out extraneous solids and excess water. Conte Report ¶¶ 9-14. This process is entirely mechanical and involves no heat or chemicals. Id. ¶ 12. The product directly resulting from this process is generally known as "virgin olive oil." Id. ¶¶ 15-17. If virgin olive oil undergoes refining to remove impurities, then it is no longer called "virgin," but remains "olive oil." Id. ¶ 18-19. By contrast, Pomace, also known as olive-Pomace oil, is made from the residue materials left over after olive oil has been mechanically extracted from the flesh of the olives. The residual skins, pits, and pulp are sent to specialized facilities, where they are dried, heated, and treated with industrial solvents to produce Pomace. Id. ¶¶ 20-23.

Kangadis does not dispute these significant differences in the production of olive oil and Pomace. See Kangadis Aff. ¶ 14. Kangadis also admits that "at all relevant times prior to this action," its "100% Pure Olive Oil" product "contained only Olive-Pomace Oil." Def.'s Br. at 7 (citing Kangadis Aff. ¶ 31). Kangadis represents, however, that it "no longer uses any Olive-Pomace Oil in [its "100% Pure Olive Oil" product] and instead, is now filling its Capatriti tins with only 'Olive Oil.'" Kangadis Aff. ¶ 51.

3

Kangadis further represents that "as of March 1, 2013, all of the Capatriti tins filled by Kangadis and distributed in the United States contain only 'Olive Oil.'" Id. However, the "olive oil" Kangadis is now using to fill tins of "100% Pure Olive Oil" is 100% refined olive oil, and contains no virgin olive oil. See id. ¶ 52, ex. O.

As explained above, the Court, on consent of the parties, has preliminarily enjoined Kangadis from selling as "100% Pure Olive Oil" any product containing Pomace, and from selling any product containing Pomace without expressly labeling it as such. In the first of the addition injunctive requests that NAOOA makes, NAOOA asks that this Court preliminarily enjoin Kangadis from selling 100% refined olive oil as "100% Pure Olive Oil," as Kangadis represents it is now doing. In support of this request, NAOOA points to a number of state, federal, and industry labeling standards that distinguish between "olive oil" or "pure olive oil," which must contain at least some virgin olive oil, and "refined olive oil," which need not contain any virgin olive oil.

The Court must first address the applicable legal standard. The Supreme Court has held that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Nevertheless, the Second Circuit continues to hold, even after Winter, that "a party seeking a preliminary injunction [must] show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted). While this suggests a more liberal standard than that set forth in Winter, here the result is the same under either approach.

With respect to the first of the addition injunctive orders that NAOOA seeks, NAOOA has shown irreparable harm. "To demonstrate irreparable harm in a Lanham Act case, a party 'must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position.'" CJ Products LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (quoting Zeneca Inc. v. Eli Lilly & Co., No. 99 Civ. 1452 (JGK), 1999 WL 509471 (S.D.N.Y. July 19, 1999)). Here, it is undisputed that NAOOA's member companies compete with Kangadis, and thus any additional sales Kangadis enjoys will likely come at the expense of NAOOA members.[1] Moreover, refined olive oil is generally cheaper

---

[1] NAOOA has standing to seek injunctive relief on behalf of its members because (1) its members would have standing to sue in their

than virgin olive oil, see Conte Report ¶ 24, and thus, to the extent Kangadis's labels are false or misleading, they provide an unfair competitive advantage.  In addition, Kangadis's labeling allegedly induces consumers to purchase a product that is not what it seems, and thus may cause consumers to lose faith in olive oil products in general.  These types of harms are quintessentially irreparable, as "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement."  Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982).

Whether NAOOA has made the required showing as to its likelihood of success on the merits is a closer question.  As stated, NAOOA relies on a series of labeling standards that distinguish between "olive oil" or "pure olive oil" and "refined olive oil."  Under New York labeling standards, for example, "olive oil" is defined as "a blend of refined olive oil[] and virgin olive oils," while "refined olive oil" is defined as "the olive oil obtained from virgin olive oils by [certain] refining methods." N.Y. Agric. & Mkts. Law § 204-a; see also N.Y. Comp. Codes R. & Regs. tit. 1, § 269(a)(1), (c) (establishing "[s]tandards of identity" for "olive oil" and "refined olive oil" using similar

---

own right, (2) the interests NAOOA seeks to protect are germane to its purpose, and (3) neither the claims asserted nor the relief requested requires the participation of individual members. See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Laboratories, Div. of/& Am. Home Products Corp., 850 F.2d 904, 914 (2d Cir. 1988) (per curiam).

definitions). New York law deems any product or label that fails to conform to these definitions "adulterated" or "misbranded," and thus unlawful. See N.Y. Agric. & Mkts. Law §§ 199-a(1), 200, 201.

Federal and industry standards similarly distinguish "olive oil" from "refined olive oil." Voluntary labeling standards promulgated by the USDA separately define "U.S. Olive Oil" and "U.S. Refined Olive Oil," requiring the former to contain some virgin olive oil. See 7 C.F.R. § 240.1534(d), (e); see also Termination of Consideration of Codex Standard, 47 Fed. Reg. 42,123 (Sept. 24, 1982) (FDA notice explaining that under certain unspecified labeling standards, only "[b]lends of virgin olive oil and refined olive oil may be labeled as 'olive oil.'"). The Conte Report likewise explains that the industry convention is that "[o]live oil is the oil consisting of a blend of refined olive oil and virgin olive oils fit for consumption as they are." Conte Report ¶ 19(b).

NAOOA also notes that Kangadis's own website has in the past touted its "100% Pure Olive Oil" product as a "wonderful blend of virgin and refined oil made from hand picked olives." Suppl. Decl. of Eryn A. Balch in Supp. of Pl.'s Reply in Supp. of Pl.'s Mot. for Prelim. Inj. ("Balch Decl.") ¶ 4. In addition, two of Kangadis's suppliers have defined "pure olive oil" as a blend of virgin and refined olive oil on their websites. Id. ¶¶ 5, 7, 9.

It is beyond reasonable dispute that by labeling 100% refined olive oil as "100% Pure Olive Oil," Kangadis is violating these various standards. NAOOA's complaint, however, does not seek direct

7

enforcement of these standards, which are either legally nonbinding or unenforceable through a private right of action.  Rather, NAOOA alleges that Kangadis's labeling constitutes false advertising or a deceptive business practice because it is impermissibly misleading to consumers.  But critically, NAOOA presents no extrinsic evidence that the perceptions of ordinary consumers align with these various labeling standards such that they would understand a product labeled "100% Pure Olive Oil" to contain a blend of refined and virgin olive oil.  For that reason, the Court is compelled to conclude that NAOOA has failed to show a likelihood of success on the merits.

It is well established that "[a] claim of false advertising [under the Lanham Act] may be based on at least one of two theories: that the challenged advertisement is literally false, i.e., false on its face, or that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 112 (2d Cir. 2010).  "Where an advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public."  Id. (internal quotation marks omitted).  But where a plaintiff proceeds on a theory of implied falsity, "a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers, and must demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the

challenged advertisement." Id. at 112-13 (internal quotation marks omitted).

Because it offers no extrinsic evidence of consumer confusion, NAOOA's Lanham Act claim may proceed only on theory of literal falsity. But the Second Circuit has made clear that "only an unambiguous message can be literally false." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007) (quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 587 (3d Cir. 2002)). Accordingly, "if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Id. at 158. Here, the Court cannot conclude that Kangadis's label is susceptible only to the impermissibly misleading interpretation advocated by NAOOA.

Indeed, the Court finds it entirely plausible that a reasonable ordinary consumer would interpret the phrase "100% Pure Olive Oil" to refer simply to a product that contains olive oil -- that is, oil derived from the flesh of the fruit of the olive tree -- and nothing but olive oil. The consumer could very well view the phrase as simply remaining silent as to whether that olive oil is virgin or refined. Of course, based on the standards NAOOA cites, olive oil industry insiders and certain regulators likely would understand Kangadis's label to describe a blend containing at least some virgin olive oil. But in the absence of any evidence to the contrary, it

9

is far from clear that an ordinary consumer, unfamiliar with industry lingo, would perceive those terms the same way.

The First Circuit's decision in Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302 (1st Cir. 2002), on which NAOOA relies, is not to the contrary. In that case, a purveyor of men's clothing marketed as "cashmere" suits that in fact contained recycled fibers, when a federal statute required recycled cashmere to be labeled as such. Id. at 307. The First Circuit held that a reasonable trier of fact could find the defendant's advertising to be literally false, because the federal statute "essentially tell[s] consumers that garments labeled 'cashmere' can be presumed to be virgin cashmere as if it had been explicitly stated." Id. at 316.

But Cashmere came to the First Circuit on an appeal from the district court's grant of partial summary judgment to the defendant, requiring the court to "construe the record evidence in the light most favorable to" the plaintiff. Id. at 308 (internal quotation marks). Based on that standard of review, the First Circuit indulged the inference that the defendant's advertising necessarily conveyed the literally false implicit message that its suits were made with virgin cashmere. The question here, however, is not whether a reasonable trier of fact could find Kangadis's label literally false, but whether it is likely to do so. As explained above, the Court cannot on the present record make a finding,

10

sufficient to support a preliminary injunction, that a reasonable factfinder is likely to resolve this question in NAOOA's favor.[2]

The analysis of the merits of plaintiff's state law claims is not materially different. "[T]o state a claim under [New York General Business Law] sections 349 and 350, a plaintiff must allege that (1) the defendant's act, practice or advertisement was consumer-oriented; (2) it was materially deceptive and misleading; and (3) that plaintiff was injured as a result." Verizon Directories Corp. v. Yellow Book USA, Inc., 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004). As explained with respect to plaintiff's Lanham Act claim, in the absence of any extrinsic evidence of consumer confusion, the Court is not persuaded that a reasonable trier of fact would likely find it materially deceptive and misleading to market 100% refined olive oil as "100% Pure Olive Oil."

The Court thus concludes that NAOOA has not shown, at this stage, a likelihood of success on the merits of its claim that it is unlawful to sell 100% refined olive oil as "100% Olive Oil." To be sure, in light of the host of state, federal, and industry labeling standards that distinguish between "olive oil" or "pure olive oil"

---

[2] In addition, the Court notes that the First Circuit's heavy reliance in Cashmere on its obligation on summary judgment to draw all inferences in the plaintiff's favor is in considerable tension with the Second Circuit's binding teaching that an advertisement amenable to more than one reading cannot be literally false. Compare Cashmere, 284 F.3d at 315 ("After drawing all reasonable inferences in favor of the nonmoving party, a rational factfinder could conclude that plaintiffs' recycled cashmere claim is one of literal falsity."), with Time Warner Cable, 497 F.3d at 158 ("[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.").

and "refined olive oil," NAOOA may have raised "sufficiently serious questions going to the merits to make them a fair ground for litigation." Citigroup Global Markets, 598 F.3d at 35. However, even under that prong of the Second Circuit's flexible preliminary injunction standard, that is not enough to for NAOOA to prevail on this motion, since NAOOA has not shown the other part of that prong, i.e., "a balance of hardships tipping decidedly" in its favor. Id.

Indeed, in all of their briefing before and after oral argument, neither party squarely addresses the balance of hardships that would result from barring Kangadis from selling 100% refined olive oil as "100% Pure Olive Oil." To be sure, declining to enjoin advertising that turns out on the merits to be false and misleading would likely cause some competitive harm to NAOOA's member companies, but at present it is entirely unclear how severe that harm would be. Moreover, NAOOA's primary concern in filing this action was not the mislabeling of refined olive oil but the mislabeling of Pomace, which has now ceased and is enjoined by the Court's existing injunction. As for the burden on Kangadis, extending the preliminary injunction as NAOOA requests would require Kangadis to immediately change either its label or its product, which no doubt would involve considerable burdens, expenses, and risks to Kangadis's consumer relationships and goodwill. Accordingly, on the present record, the Court cannot conclude that the balance of hardship tips decisively in NAOOA's favor.

Turning to the second and third of the additional injunctive measures that NAOOA seeks, NAOOA also asks this Court to order Kangadis to provide notice to consumers regarding its past mislabeling of tins packed containing Pomace in two ways: through Kangadis's website, and through stickers or other labels, which would be sent through Kangadis's distribution chain and affixed to Kangadis's tins packed before March 1, 2013, and which would inform potential consumers that the tins in fact contain Pomace.

Turning first to the question of irreparable harm, the Court finds that NAOOA likely will be irreparably harmed if such notice is not provided. As the Court explained at oral argument, this legal question hinges on a factual determination as to whether a significant number of tins of "100% Pure Olive Oil" containing Pomace remain available for sale in the marketplace. NAOOA points out that Kangadis sells approximately a million tins of "100% Pure Olive Oil" per year, see Declaration of Eryn A. Balch in Supp. of Pl.'s Suppl. Mem. ¶ 2, and the packaging states that the product remains edible for a full two years, see Balch Decl. ¶ 6(a). NAOOA also notes that the average U.S. consumer consumes approximately one liter of olive oil per year, and thus a large quantity of 3-liter tins of "100% Pure Olive Oil" containing Pomace likely remain on consumers' kitchen shelves. See NAOOA Suppl. Br. at 7.

For its part, Kangadis represents that on March 1, 2013, it began "fill[ing]" its Capatriti tins with refined olive oil, Kangadis Aff. ¶ 51, and thus by now much of the "100% Pure Olive

13

Oil" being offered for sale in the market is refined olive oil and not Pomace. Kangadis further notes that as a result of the publicity surrounding the filing of this lawsuit on February 6, 2013, a number of orders of "100% Pure Olive Oil" were cancelled, decreasing the supply of Capatriti tins available in the marketplace in the interim below their usual levels. Aff. of Themis Kangadis in Further Opp'n to Pl.'s Mot. for Prelim. Inj. ¶¶ 9-10.

On balance, the Court concludes that NAOOA has shown that it is likely that a not insignificant number of tins of "100% Pure Olive Oil" containing Pomace remain available for sale in the marketplace. NAOOA's sales figures show that on average Kangadis sells tens of thousands of Capatriti tins per week, and the evidence of cancelled orders shows only that Kangadis's recent distribution volume is somewhat diminished, not that it is insignificant. Moreover, while Kangadis represents that Capatriti tins "filled" after March 1, 2013 contain only refined olive oil, it makes no representation as to when it put its last tins containing Pomace into its distribution chain, nor how long it takes the average tin to filter through the distribution chain to the end consumer. Given the product's long shelf life, the Court concludes that it is likely that a considerable number of tins containing Pomace remain at some point in the distribution chain and have not yet been sold to end consumers.

Accordingly, the Court finds that NAOOA is likely to be irreparably harmed if potential consumers are not notified that

14

Capatriti tins packed before March 1, 2013 contain Pomace. This irreparable harm, however, can be fully addressed by requiring Kangadis to send appropriate stickers through its distribution chain to affix to unsold Capatriti tins that contain Pomace. Notice in this form will be targeted narrowly at potential consumers who might otherwise purchase Pomace labeled as "100% Pure Olive Oil," and will render unnecessary any broader notice to consumers through Kangadis's website. To be sure, website notice would go beyond the stickers in informing past purchasers as to the contents of Capatriti tins that are still sitting on their kitchen shelves, but NAOOA fails to explain how notice to past purchasers would avert any irreparable harm to its members. Once the consumer has decided to purchase Capatriti rather than another brand, the harm to Kangadis's competitors has been done, and cannot be undone by the provision of website notice.[3]

---

[3] In its pre-argument briefing, Kangadis argues that NAOOA's argument as to irreparable harm is fatally undermined by its unreasonable delay in seeking a preliminary injunction. See Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 968 (2d Cir. 1995) (noting that unreasonable delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury"). Specifically, Kangadis points out that that in 2007, NAOOA sent a letter to Kangadis stating that NAOOA's quality control program had tested a sample of "Capatriti extra virgin olive oil," which was determined to "contain[] a large proportion of olive pomace oil." Letter from Bob Bauer, President of NAOOA, to Aristidis Kangadis, CEO of Kangadis (Mar. 22, 2007), ex. B to Kangadis Aff. Kangadis also notes that NAOOA obtained the samples underlying the Conte Report in August 2012, but did not file this action until February 2013. The Court, however, does not find NAOOA's delays unreasonable under the circumstances. To begin with, the adulterated sample NAOOA discovered in 2007 pertained to extra virgin olive oil, while this suit concerns "100% Pure Olive Oil."

Turning to the merits of NAOOA's claim that it is unlawful to sell Pomace as "100% Pure Olive Oil," the Court finds that NAOOA is likely to prevail on this claim. Like its claim with respect to refined olive oil, NAOOA points to a number of state, federal, and industry labeling standards, all of which distinguish between olive oil and Pomace, and require the latter to be labeled as such. See 7 C.F.R. § 240.1535 (voluntary USDA standard providing that "[o]live-pomace oils shall not be labeled as 'olive oil'"); 47 Fed. Reg. at 42,123 (FDA notice explaining that, under certain unnamed labeling standards, "oil extracted from olive pomace and pits by chemical means and refined to make it edible must be labeled either 'refined olive-residue oil' or 'refined extracted olive-residue oil'"); N.Y. Agric. & Mkts. Law § 204-a(a), (b) (separately defining "olive oil" and "olive pomace oil"); N.Y. Comp. Codes R. & Regs. tit. 1, § 269(a)(1), (c) (establishing separate "standards of identity" for

---

See Kangadis Aff. ¶¶ 5-6 (distinguishing between these products). Moreover, before investigating further, NAOOA could reasonably assume that the adulterated sample was the result of a discrete quality control error rather than an ongoing effort to pass off Pomace as olive oil. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 39 (2d Cir. 1995) ("[A] delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the [misconduct] is."). Delays resulting from the careful preparation of the Conte Report, which has been critical to the Court's resolution of this motion, likewise were not unreasonable. See id. ("[A] delay caused by a plaintiff's good faith efforts to investigate . . . does not rebut the presumption of irreparable harm."). The Court finally notes that Kangadis has not identified any material prejudice it has suffered as a result of NAOOA's delay. See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996) ("In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action.").

16

"olive oil" and "olive pomace oil"); International Olive Council, IOC Trade Standard, COI/T.15/NC No 3/Rev.6 § 2.2 (Nov. 2011) (trade standard of U.N.-based intergovernmental body providing that "[o]live oil is the oil obtained solely from the fruit of the olive tree . . ., to the exclusion of oils obtained using solvents or re-esterification processes").

Unlike NAOOA's claim with respect to refined olive oil, however, the Court finds that NAOOA has adequately shown that it is literally false, and not simply potentially misleading, to advertise Pomace as "100% Pure Olive Oil." While Pomace may in some sense be "olive oil" in that it is an oil derived from olives, it is not remotely what the ordinary consumer understands "olive oil" to be. Indeed, in arguing that NAOOA should be required to post a bond, Kangadis affirmatively asserts that if consumers are notified "about the presence of Olive-Pomace Oil in Capatriti, its sales of Capatriti certainly will plummet." Def. Br. at 23. That assertion is telling, since it would be unfounded if consumers already understood the term "olive oil" to encompass an industrially processed substance like Pomace.[4]

As to the balance of hardships and the public interest, the Court finds that these factors also favor an injunction. The only hardships the injunction will cause to Kangadis are the modest

---

[4] Olive oil and refined olive oil, by contrast, are not so fundamentally different. Both substances come from mechanically pressed olive flesh, and indeed, under the labeling standards NAOOA relies on, "olive oil" actually contains refined olive oil.

17

direct costs of creating and distributing the stickers, as well as some diminished goodwill from any resulting negative publicity. But NAOOA assured the Court at oral argument that, in contrast to its role in inviting an article in the New York Times the same day this action was filed, it had no intention of trumpeting this Court's preliminary relief to the press. Based on that representation, any diminished goodwill Kangadis suffers from this injunction will largely be of its own doing, as it "can assert no equitable interest in the perpetuation of an advertising campaign that is literally false." Castrol Inc. v. Pennzoil Co., 799 F. Supp. 424, 440 (D.N.J. 1992), aff'd, 987 F.2d 939 (3d Cir. 1993). In the absence of an injunction, however, NAOOA will continue to suffer irreparable lost sales and diminished goodwill. And as for the public interest, that interest will not be harmed by this injunction, and will indeed be well served by ensuring that consumers do not purchase a product based on false advertising. See Snuggly Plushez, 809 F. Supp. 2d at 149 ("[T]he public interest is served by preventing customer confusion or deception." (internal quotation marks omitted)).

The final, remaining issue related to plaintiff's motion is the amount of any bond NAOOA should be required to post. Federal Rule of Civil Procedure 65(c) provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." NAOOA contends that no bond is necessary; Kangadis initially sought

18

a $1 million bond, but in its post-argument submission now seeks a $10 million bond, which would approximate the gross profits Kangadis expects to earn from its Capatriti product over the next three years. Because the Court cannot conclude that Kangadis would be totally unharmed by this injunction, some security is appropriate. See Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996) ("[I]t has been held proper for the court to require no bond where there has been no proof of likelihood of harm."). Kangadis's suggested amounts for the bond, however, are wildly unreasonable. This case will be finally adjudicated in far less than three years, and there is no reason to believe that the narrow notice provided by the stickers would totally eviscerate the product's profits. In the event the injunction has issued in error, a $10,000 bond likely will adequately compensate Kangadis for the costs of the ordered notice and any damages they may cause.

Accordingly, for the foregoing reasons, the Court hereby confirms its additional preliminary injunction ruling issued on April 19, 2013. The Court thus declines to enjoin Kangadis from selling refined olive oil as "100% Pure Olive Oil," orders Kangadis to provide reasonable notice to potential consumers of its past mislabeling of Pomace as set forth in the April 19 injunction, and orders NAOOA to post a $10,000 bond not later than April 24, 2013.

SO ORDERED.

Dated: New York, NY
April 24, 2013

JED S. RAKOFF, U.S.D.J.