```
 1    D4C0NOR1                        Argument

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------x

 4    NORTH AMERICAN OLIVE OIL
      ASSOCIATION,
 5
                     Plaintiff,
 6
               v.                              13 CV 0868
 7
      KANGADIS FOODS,
 8
                     Defendant.
 9
      ------------------------------x
10                                      New York, N.Y.
                                        April 12, 2013
11                                      12:30 p.m.

12    Before:

13                    HON. JED S. RAKOFF,

14                                      District Judge

15                        APPEARANCES

16    SIDLEY AUSTIN LLP
           Attorney for Plaintiff
17    BY:  TIMOTHY TREANOR
           NITIN REDDY
18

19
      FARRELL FRITZ, P.CL
20         Attorney for Defendant
      BY:  MICHAEL SCHOENBERG
21

22    Present:  Erin Balch

23             Themis Kangadis

24

25
```

1    (In open court)

2              THE COURT:  So I'm extremely sorry for the extended

3    delay.  Another matter that I just had to deal with came up.

4              I'm ready to hear argument.  This is North American

5    Olive Oil Association vs. Kangadis Food, Inc.

6              MR. TREANOR:  Tim Treanor from Sidley Austin here for

7    the North American Olive Oil Association.  With me is my

8    partner Nitin Reddy, and Erin Balch, who is executive vice

9    president of the NAOOA.

10             Your Honor, I would request, Mr. Reddy is a member of

11   the bar in California, and I would request that he be admitted

12   pro hoc vice for purposes of this matter, although I expect to

13   be addressing the Court today.

14             THE COURT:  That is fine, but why didn't you file, in

15   advance, the requisite form?

16             MR. TREANOR:  Your Honor, our apologies for not doing

17   that.  We got a Certificate of Good Standing for Mr. Ready on

18   April 8.  So we do have the paperwork together now to actually

19   make the filing, but we had not done that, we have not done it

20   as of yet.

21             Mr. Reddy flew in from California yesterday --

22             THE COURT:  April 8 was --

23             MR. TREANOR:  Four days ago, your Honor.

24             THE COURT:  Four days ago.

25             MR. TREANOR:  Yeah.

1          THE COURT:  So, do you need to tell your clients from

2     now on you that Sidley Austin is incapable of putting together

3     a two-page form application --

4          MR. TREANOR:  No, don't --

5          THE COURT:  -- in four days?

6          MR. TREANOR:  -- I don't think we'll be telling our

7     clients that, your Honor.

8          THE COURT:  All right.  Well, anyway, he is admitted,

9     but let's make sure we get that in.

10          MR. TREANOR:  Thank you, your Honor.

11          THE COURT:  All right.

12          MR. SCHOENBERG:  Michael Schoenberg for Kangadis

13     Foods.  With me is the president the Kangadis Foods.

14          THE COURT:  Just before we begin, I received this

15     morning the complaint in a new case that appears to be based on

16     the same general set of allegations, but is a putative class

17     action filed by an individual plaintiff Joseph Eben and

18     Yeruchum Jenkins -- it's an interesting combination.

19          Is defense counsel aware of that case?

20          MR. SCHOENBERG:  I had not.  I was not aware the

21     complaint had been filed.  I received a letter from plaintiff's

22     counsel saying they might be filing such a complaint.

23          THE COURT:  Why don't you contact, assuming you're

24     gonna be representing Kangadis in that case, as well, contact

25     the plaintiff's counsel once you have pulled this off of Pacer

1    and let's have a telephone conference, certainly by next

2    Tuesday.  Because we might as well just have the same case

3    management plan for both cases, it seems to me.  But we'll need

4    to hear from them.

5              MR. SCHOENBERG:  All right.  So let me hear from

6    moving counsel, and then from defendant counsel.

7              MR. TREANOR:  Yes, your Honor.

8              This matter is Lanham Act case.  It's a false

9    advertising case.  It's the plaintiff's position that the

10   defendant's product advertisements are literally false.  The

11   products at issue are --

12             THE COURT:  No, I know all that, and forgive me.  I

13   guess, I can understand -- well, I guess the first question I

14   have is, there is some sort of letter sent umpteen years ago,

15   and your adversary says that, therefore, you have sat on your

16   hands, what about that.

17             MR. TREANOR:  Well, your Honor, one of the programs

18   that the NAOOA has is a program for monitoring the marketplace

19   for product that does not meet international standards and

20   labels.  And during the course of that monitoring program NAOOM

21   found some samples that were believed to contain pomace, and

22   put Mr. Kangadis on notice of that.  And that was back in 2007.

23   Nothing happened.  Apparently, as a result of that, the

24   association was unaware of the extent of the conduct.  We have

25   learned, through the response papers of the defendant, that in

1    fact not only was the defendant selling entirely pomace, not

2    just blended or adulterated olive oil that was adulterated with

3    pomace but, in fact, entirely pomace, and doing that for the

4    course of the last five years at least.  That was not known to

5    association.  It was merely part of the monitoring program to

6    put them on notice.  There was the possibility that they had

7    not handled their product properly, that they were not caring

8    for their product.

9         As a result of that, the hope was that Kangadis would

10   address the issue, and make sure that their products were in

11   compliance with the various labeling standards and the like.

12        That didn't happen.  They have aggressively grown

13   their market share as a result of selling what is not olive

14   oil, a product that does not meet the standards set, in any

15   regulatory or industry association body, standard-setting body,

16        And more recently, additional testing was done.  And

17   the association spent time and effort to approach this thing

18   very seriously.  The association has never taken an action like

19   this before.  Care and attention was put into building a case

20   that would be solid, and that we could come before your Honor

21   and be able to establish, very clearly through one of the

22   world's foremost experts, that in fact this was adulterated

23   product.  And, indeed, we are here now with the defendant

24   essentially conceding the key fact, which is that -- and more

25   than frankly, we expected, because it's not just that they have

1    some product out there that contains some pomace, it is that

2    all of their products, at least their 100 percent virgin olive

3    oil product is all pomace, and has been for five. years.  And

4    so the facts have changed quite significantly --

5            THE COURT:  Didn't they say they are fixing that?

6            MR. TREANOR:  Well, they have represented in their

7    papers, that as of March 1 they have replaced the product in

8    their tins with something that they have stated meets USDA

9    stated standard for olive oil.

10           First of all, they have done nothing about product

11   that is out there in the marketplace already.  And when they

12   have 15 percent of the market share in the nation, that's a lot

13   of olive oil that is out there that is falsely labeled,

14   continues to be, no doubt, be sold and consumed.  They have

15   done absolutely nothing about that.

16           In addition, we don't believe that the Court should

17   accept, necessarily, the representation, when the facts are

18   that they have been on notice that their products are falsely

19   advertising the contents of their tins for the amount of time.

20   And given the volume that they have sold, we don't believe that

21   the Court should accept that representation as sufficient.

22           I would also note that, as a matter of -- under the

23   case law that's out there, the violation cannot -- the Court's

24   power to act on the violation is not necessarily mooted by the

25   action that the defendant is taking.

1          And if that were the case --

2          THE COURT:  No, I agree with that.

3          But, it's one thing to say the matter is not moot, I

4     don't think it is moot, I'll hear from your adversary on that

5     if he wishes to pursue that.  But that's of the not the same as

6     saying you are entitled to injunctive relief.

7          For example, you ask for them to institute appropriate

8     quality control measures.  Why should you be entitled to that?

9          MR. TREANOR:  Well, your Honor, I think that's the

10    least important of the relief we've requested.

11         THE COURT:  Good.  So, we can go home.

12         MR. TREANOR:  No, I wouldn't say that, your Honor.

13         THE COURT:  You better tell me why you're entitled to

14    it.

15         MR. TREANOR:  That relief was requested, because of

16    the concerns that perhaps there was a quality control issue

17    here.

18         We've got a defendant who has been caught red-handed;

19    with a massive amount of product that's been distributed all

20    over this country, and is now, because it's before this Court,

21    is now saying, okay, you have got us, we're going to switch the

22    product, but we believe that we are free to continue to act as

23    we had before, if we so choose.  And we have a concern that the

24    way --

25         THE COURT:  Yeah, well, so, I understand why you would

wish, if you otherwise satisfy the standards for injunctive

relief for an order barring them from selling as 100 percent

pure olive oil, any product containing pomace or any other

substance that is not more narrowly known as olive oil, and

from selling any product containing pomace without labeling it

as such.

MR. TREANOR:  Right.

THE COURT:  But I'm perplexed as to what showing, if

any, you have made that you're entitled to, quote, "quality

control measures." And I still haven't heard any.

MR. TREANOR:  Well, your Honor, it was our belief

that, based on the facts that we are encountering, that there

was a quality control issue.  We have not submitted facts to

establish that there is in fact a quality control issue.

I would say, however, that given the fact that this

defendant was selling pomace as olive oil for five years, and

that's 15 percent of the product that is out there in this

country, up until March 1, that that speaks to the potential

existence of a serious quality control issue.  It speaks to no

quality control within Mr. Kangadis' operation.

So that would be the basis for our requested relief.

The key relief that we seek, however, is the other points that

we have raised as the focus of injunctive relief.  And that is

that they not market pomace as 100 percent pure olive oil any

longer.  And, also, that they notify anyone, customers and the

1    like, who have received product that is mislabeled that it, in

2    fact, contains pomace.

3             THE COURT:  All right.  One other thing -- well, let

4    me hear from your adversary, and we'll come back to you in a

5    minute.

6             MR. SCHOENBERG:  May I use the podium, your Honor?

7             THE COURT:  Sure.

8             MR. SCHOENBERG:  To begin with, I think your Honor

9    brings up a very good point.  2007, six years ago, the

10   association has made the identical claims they are making now.

11            And if you look at exhibit B to our opposition, you

12   would see their letter from March 22, 2007, where they

13   specifically allege --

14            THE COURT:  So how come you didn't do, then, what you

15   say you have done now?

16            MR. SCHOENBERG:  Because, your Honor, we don't believe

17   there is any federal regulation, or state law, or regulation,

18   especially not in 2007 that required them to do that, to change

19   the label, as the association wanted.

20            THE COURT:  So now the assertion then is that

21   regardless of whether there is a standard or not, the common

22   understanding of olive oil is not what you are selling.  So

23   that's not maybe what you regarded the letter to be about,

24   therefore it's not something that's, in effect, been the

25   subject of delay.

1           MR. SCHOENBERG:  Well, I would disagree that

2     the product that we were selling, the pomace oil, was not olive

3     oil in the colloquial sense.

4           THE COURT:  I know you disagree with that, but I

5     disagree with you on that, and you're going to waste your time

6     if you argue that.

7           MR. SCHOENBERG:  If I could address another point of

8     the delay.

9           THE COURT:  Yeah.

10          MR. SCHOENBERG:  The case law is legion, 4 months

11    delay between knowledge and bringing in an injunction

12    application is too long, too long to it sit on the rights.

13          It took Mr. Professor Conte 4 months, after it had

14    taken, several months to get the supplies to them before this

15    injunction application was made.  We are talking about close to

16    about half a year since the samples were first sent to

17    Professor Conte.  It doesn't take that long to test olive oil.

18          They didn't test in '07, they knew it, they waited.

19    And the reason they waited isn't out of  some altruistic motive

20    toward the public, it's because Kangadis is doing well in the

21    marketplace.  Because they have started competing with some of

22    the association's biggest members.  And they have recently

23    gotten contracts with Wal*Mart.  And that's a direct threat to

24    their members who are not parties to this litigation.  That's

25    the motive behind this litigation.  It's not there is some

1    public harm, there isn't.

2              The public is getting a good product, an olive oil

3    product, according to Ms. Balch.  An olive oil product for less

4    money than they would spend for extra virgin olive oil, virgin

5    olive oil, or other types of olive oil.  And according to

6    Ms. Balch's testimony, it's equally as healthy.  It is olive

7    oil.  It is from a different part of the olive, there is no

8    question about that, but olive pomace is olive.

9              THE COURT:  The substance that you are now using,

10   since March, is different from pomace; yes?

11             MR. SCHOENBERG:  It is a different grade of olive oil;

12   that's correct.

13             THE COURT:  And, well, but you have chosen,

14   voluntarily, to use it; correct.

15             MR. SCHOENBERG:  Yes.

16             THE COURT:  So you don't think, apparently, that your

17   market will be affected by the switch?

18             MR. SCHOENBERG:  No, absolutely not.  Capatriti 100

19   percent pure olive oil is a loss leader for Kangadis Foods.  So

20   whether they are filling it with olive pomace oil, or what they

21   are currently selling as olive oil, ultimately, it doesn't make

22   a difference.

23             THE COURT:  So why aren't you agreeable to an

24   injunction that says that, from now on, you will just -- you

25   wouldn't use pomace, you will use this other stuff.

1          MR. SCHOENBERG:  That is an excellent question, and

2     I'll tell you why.

3          THE COURT:  Uh-huh.

4          MR. SCHOENBERG:  Just like they brought this suit to

5     complete unfairly through litigation against the competition,

6     the association has shown a penchant for running to the press.

7          Indeed, this lawsuit was filed February 6, February 6

8     that morning before the lawsuit was available on Pacer, there

9     was an article in the New York Times saying how Kangadis is the

10    worst thing since the devil, and what they're doing is terrible

11    in the marketplace, and they're selling rancid oil, what have

12    you.

13         An injunction, in a public document, there is an

14    absolute certainty that the association is gonna run around to

15    competitors, waving it in front of their faces:  See, we were

16    right, Kangadis is doing something wrong, even the judge agreed

17    to it.

18         So rather than have a public document out there, we

19    choose to -- it.  We believe that moots the complaint.

20         THE COURT:  Let me go back to your adversary, I'll

21    come back to you in a minute, also.  Thank you.

22         So what was this Times article, or what was the -- is

23    this something instigated by your client?

24         MR. TREANOR:  There was a New York Times article, your

25    Honor.  And part of the approach of the organization was to not

1   only bring the case, but also focus some attention on this

2   issue.  Obviously, it's a very serious issue.  It's a clear

3   issue.  We've gotten a food product that has not been getting

4   much --

5         THE COURT:  One has to worry if you're asking the

6   Court to exercise its equitable powers, and no court wants to

7   be made the pawn of a press warrant.

8         If I were to grant, in part or in whole, your

9   requested injunction, what plans if any do you have to notify

10   the press?

11        MR. TREANOR:  Your Honor, there are no plans to notify

12   the press.

13        I do think that part of this association's mission is

14   to draw attention to this particular issue.  It is not a

15   mission in terms of this lawsuit, necessarily, but it's part of

16   the overall mission of the association.

17        THE COURT:  Well, I -- that, of course, I understand,

18   but that's different than using a lawsuit as a weapon in a

19   media event.  The Court is not blind, of course, to the fact

20   that frequently happens, doesn't make it appealing to the

21   Court.  Was this was an article -- does someone have a copy of

22   that article?

23        MR. SCHOENBERG:  Yes.

24        MR. TREANOR:  I have a copy of it, your Honor.

25        (Pause)

```
 1              THE COURT:  Yes, well, what day was the complaint
 2    filed in this case?
 3              MR. REDDY:  February 6th.
 4              THE COURT:  Pardon?
 5              MR. REDDY:  February 6.
 6              MR. TREANOR:  February 6.
 7              THE COURT:  February 6.
 8              And when was it served on the defendant?
 9              MR. TREANOR:  Your Honor, I believe it was dropped
10    served that same day.  I'm not entirely certain of that.
11              MR. SCHOENBERG:  No, it was at least two days later.
12              THE COURT:  Because what we have here, while it's -- I
13    wouldn't agree with defense counsel that it carried quite the
14    moral or religious connotations that he suggested, is an
15    article that in which not only the North American Olive Oil
16    Association, but its counsel, make statements about the merits
17    of the case to the press at a time when it appears that the
18    defendant either had just received it or certainly had not had
19    a chance to digest it.
20              The docket shows that service was accomplished on
21    February 7th.  This article is dated February 6th, the date of
22    the lawsuit being was filed.  So even before the defendant is
23    served, we have plaintiff's counsel, as well as the association
24    trumpeting their allegations.
25              So, for example, according to the article that
```

1   appeared in the New York Times, it has the following quote from

2   Mr. Trainer:  Quote, "This is a very, very clear-cut case of

3   false advertising," said Timothy J. Treanor, a lawyer at Sidley

4   Austin, who is representing the association.  "This is not a

5   case where there is room for argument about the degrees of

6   truthfulness.  Here, 100 percent olive oil is what it states on

7   the tin and, by any standard, that's not true."

8        I will note that in the original version of this

9   article, Mr. Treanor's name was misspelled.  And he must be

10  very gratified that they corrected that.

11       So do I have to be concerned, because a preliminary

12  injunction is not a final determination of the merits, and

13  contrary to Mr. Treanor's suggestion to the press, the

14  determination of the merits had not been already determined

15  when the plaintiff filed its complaint.

16       But, in any event, do I have to be concerned that if I

17  issue an injunction, the North American Olive Oil Association,

18  let alone, its counsel, will be going to the press and saying

19  see, the judge has said that the other side engaged in false

20  advertising.

21       MR. TREANOR:  Well, your Honor, it's not our current

22  intention.  We do not have.

23       THE COURT:  Because that wouldn't be true, would it

24  counsel?

25       MR. TREANOR:  No, it would not be true, your Honor,

1    we --

2              THE COURT:  That would be a case of false advertising,

3    in effect, by the North American Olive Oil Association.

4              MR. TREANOR:  Yes, it would.  In fact, your Honor,

5    this was a big step for the association.  The steps were taken,

6    as I have said, to make sure that the complaint got some

7    attention.  Nothing was said that we don't stand by

8    100 percent.

9              THE COURT:  Did you tell the reporter who interviewed

10   you that your firm had, in fact, not yet even served your

11   adversary?

12             MR. TREANOR:  No, your Honor, the question wasn't

13   asked.  But it was not --

14             THE COURT:  So I see they called Mr. Kangadis.  It

15   says Themis Kangadis, an executive with the company, said he

16   had not heard of the lawsuit, and would ask the company's

17   lawyers to look into it, quote, "I had no idea," close quote,

18   Mr. Kangadis said.

19             He, in effect, was blind-sided because he had not even

20   been served with the complaint.

21             MR. TREANOR:  Well, your Honor, I do believe that were

22   attempts that day made to serve Mr. Kangadis.  I don't believe

23   he knew about the lawsuit on the sixth, so, you know, your

24   Honor's observation is correct.

25             THE COURT:  Certainly on the seventh, according to the

1    docket sheet.

2              MR. TREANOR:  Right.

3              With regard to the preliminary injunction, your Honor,

4    it is not our intention to go out and advertises it.  The

5    association is seeking the relief that it is asking for.  And

6    it's not part of the strategy to draw attention to preliminary

7    relief.

8              THE COURT:  Let me go back to defense counsel.

9              Thank you, counsel.

10             THE COURT:  How much of your product is still out

11   there in retail stores that doesn't that contain pomace as

12   opposed to the new stuff?

13             MR. SCHOENBERG:  It's an incredibly difficult question

14   to answer.

15             THE COURT:  Well, that's what I get paid to do, put

16   those questions.

17             MR. SCHOENBERG:  Given the amount of time that has

18   passed since the changeover, talking about more than a month at

19   this point, I would imagine not much.  The problem with

20   answering that question is we don't sell, Kangadis doesn't sell

21   directly to Stop And Shop, A&P, what have you.  They sell to

22   brokers, who then palletize whatever products; you know, salad

23   dressings, vegetables that the supermarket then needs, and then

24   ships that off to the supermarket.  So we can't say with any

25   great certainty which supermarkets contain our products, other

1    than Wal*Mart, obviously.  Or even further down the economic

2    chain, which final ultimate consumers have actually bought the

3    product.  So a letter to every supermarket would be overbroad.

4    And given that that would be a mandatory injunction, I don't

5    think that the association has met that standard.  Such a

6    letter to ultimate consumers, the individuals, like all of us,

7    would be impossible, couldn't do it.  If we had to send a

8    letter to the buyers, the middlemen, it could be done.  And I

9    think that's something we could potentially be amenable to.

10          In terms of the publicity, as well, I have discussed

11   this with Mr. Treanor, and we would be, depending on the terms,

12   I shouldn't say happy, but we would probably be interested in

13   entering into some sort of settlement agreement with injunctive

14   relief that prevents us from doing what they claim that we were

15   doing in the past, just like your Honor was saying, and that

16   settlement agreement would then be confidential.  And if we

17   were to breach the settlement agreement, which we wouldn't,

18   then we --

19          THE COURT:  You are talking to the wrong judge when

20   you are talking about "confidential."  I can't prevent you

21   from, if you reach a settlement that's confidential, I can't

22   prevent you from keeping it confidential.

23          MR. SCHOENBERG:  I guess the point --

24          THE COURT:  Very, very unappealing as a matter of

25   general policy, having nothing to do with this case.

 1          MR. SCHOENBERG:  I understand.  I mean as an

 2    alternative, I was just thinking as we were sitting here, such

 3    an injunction, or consent injunction, Mr. Treanor and I would

 4    work it out.

 5          THE COURT:  Well, here is the injunction I propose to

 6    issue in about five minutes.

 7          After certain preliminary stuff:  Defendant is hereby

 8    preliminarily enjoined, (1) from selling as, quote, "100

 9    percent pure olive oil" any product containing pomace, or any

10    other substance that is not commonly known among consumers or

11    among recognized standard setters as olive oil.  And, (2) from

12    selling any product containing pomace without expressly

13    labeling it as such.

14          So I would not ask you to recall anything that is out

15    there, now, and I would not ask you to take this to quality

16    controls, but I would ask you, on pain of contempt -- not ask

17    you, I would order you, to do it in effect what you say you

18    have been doing voluntarily since March 1.  And hereinafter do

19    it forever that way, or at least until we reach the merits of

20    this lawsuit.  Forever is a little strong, maybe given my

21    normal standards, we are talking 6 to 9 months, that's a rough

22    approximation of forever.

23          So, do you object to that?

24          MR. SCHOENBERG:  Generally, no, I think it's the

25    second clause in the first part of the relief.  I couldn't get

1    it all down, but --

2              THE COURT:  Let me read it to you again.

3         And I want to hear from plaintiff's counsel, as well.

4              Defendant is hereby preliminarily enjoined: (1)from

5    selling as, quote, "100 percent pure olive oil," any product

6    containing pomace or any other substance that is not commonly

7    known among consumers, or among recognized standard setters, as

8    quote, "olive oil," close quote; and (2) from selling any

9    product containing pomace without expressly labeling it as

10   such.

11             MR. SCHOENBERG:  Again, the issue is the second

12   clause of the first part of the injunctive relief having to do

13   with "commonly known by consumers as olive oil."

14             USDA, if we had a defined standard, say USDA standards

15   which are voluntary --

16             THE COURT:  If you want to use that one, I'll hear

17   from plaintiff's counsel, but I could make that --

18             MR. SCHOENBERG:  The problem is that doesn't define,

19   quote/unquote, "olive oil."

20             THE COURT:  All right.

21             MR. SCHOENBERG:  They have different grades, so.

22             THE COURT:  So, I'm willing to -- how would you define

23   it, assuming as you should, I repeat except I'm not going to

24   treat any pomace-based product as olive oil.

25             MR. SCHOENBERG:  Well, I think that you could strike

1    that second clause where it is subjective as to what consumers

2    believe, or standards setter believe, and just keep it with

3    pomace, olive pomace oil.  From selling.

4            THE COURT:  The only reason I had that in, is I didn't

5    want to create a loophole where there is something else you

6    could substitute.  But if you want to give me some alternate

7    language, I'm perfectly happy to hear that.

8            MR. SCHOENBERG:  Well, I think that we could use

9    the -- and before I commit to something, I'd really like to

10    speak with Mr. Kangadis.

11            THE COURT:  Of course.

12            MR. SCHOENBERG:  But I think we could use USDA

13    Standards Section 52.1534, which is called grades of olive oil,

14    so that you couldn't sell 100 percent pure olive oil as any

15    product containing anything other than those grades.  And the

16    reason I raise that, is there is a separate grade of olive

17    pomace oil, Section 52.1535 to be excluded.

18            THE COURT:  You are enjoined from selling as has 100

19    percent pure olive oil any product containing pomace or any

20    other substance that is not in accord with -- give knee that

21    section again?

22            MR. SCHOENBERG:  You could say:  Not sell 100 percent

23    pure olive oil if it contains any of the grades of olive pomace

24    oil referenced in Section 52.35 of the USDA voluntary

25    standards.

 1                THE COURT:  Let me hear from the other side.  I don't

 2     recall, did you submit a proposed preliminary injunction order?

 3                MR. TREANOR:  Your Honor --

 4                THE COURT:  I don't think so.

 5                MR. TREANOR:  We proposed, generally, the relief we

 6     were seeking, but we have not proposed the language.

 7                THE COURT:  You did not.

 8                MR. TREANOR:  We did not.

 9                THE COURT:  So what language would you use?

10                MR. TREANOR:  Your Honor, we're fine with the USDA

11     standard.

12                THE COURT:  Okay.  So:  Enjoined from selling as 100

13     percent pure olive oil, any product containing pomace or any

14     other substance that is not in accord with -- is that the way

15     to put it -- and give me the USDA standard 52.35.

16                MR. TREANOR:  52.1534, grades the olive oil.

17                THE COURT:  All right, wait, does someone have that

18     there?

19                MR. TREANOR:  Yes.

20                THE COURT:  Let me just copy it down.

21                MR. TREANOR:  There is one section on grades of olive

22     oil, and one on grades of pomace oil.

23                THE COURT:  Now, you folks are more expert in this

24     than I am, but it looks to me like it could be, the wording

25     could be:  Enjoin one from selling as 100 percent pure olive

```
 1   oil any product containing pomace or any other substance that
 2   is not in accord with USDA section 52.1534(a) or (b).
 3              MR. SCHOENBERG:  May I be heard?
 4              THE COURT:  Yes.
 5              MR. SCHOENBERG:  There is a difference between virgin
 6   olive oil, and extra virgin olive oil, and quote/unquote
 7   "capital O" olive oil.  Those are different grades.  Each one
 8   of those.
 9              THE COURT:  You presumably are not wanting to sell
10   (c), which is US virgin olive oil not fit for human
11   consumption.
12              MR. SCHOENBERG:  That's right.  What we're actually
13   selling is either (d) or (e).
14              THE COURT:  I'm sorry (d).
15              MR. SCHOENBERG:  (d) or (e).
16              If we were selling virgin olive oil, or extra virgin
17   olive oil, this would be a --
18              THE COURT:  So neither (d) nor (e) can contain pomace.
19              MR. SCHOENBERG:  Correct.
20              THE COURT:  I see.
21              MR. SCHOENBERG:  Yes.
22              THE COURT:  All right, so we could just say, (a), (b),
23   (d), or (e); yes?
24              MR. SCHOENBERG:  Yes.
25              THE COURT:  All right.
```

```
 1                    Let me hear from plaintiff's counsel.

 2                    THE COURT:  Okay, that's agreeable?  You have been

 3          admitted pro hoc --

 4                    MR. REDDY:  Subsection (e).

 5                    THE COURT:  -- without, although close call, of

 6          course.

 7                    MR. REDDY:  I apologize for that, your Honor.

 8                    Subsection(e) is not supposed to be called pure olive

 9          oil, it is a technical term, so I think it's just (d).

10                    THE COURT:  You could live with (a) (b) or (d).

11                    MR. REDDY:  Correct.

12                    THE COURT:  Okay, how about defense counsel?  You're

13          not selling (e) are you?

14                    MR. SCHOENBERG:  No.  No, we are, actually.  In fact,

15          (a) and (d) oil sales, one of the wholesalers of olive oil

16          defines their refined olive oil as pure olive oil.  And it's

17          not in the papers, it's on their website, I'll give you the

18          cite.

19                    THE COURT:  No.  No, my only question is are you

20          selling something that falls within 52.1534(e).

21                    MR. SCHOENBERG:  Yes.

22                    THE COURT:  And this is, we are not talking about your

23          pomace stuff, we are talking about the new stuff.

24                    MR. SCHOENBERG:  Currently, correct.

25                    THE COURT:  Okay.  And why does it fall within (e) as
```

1    opposed to (d).

2              MR. SCHOENBERG:  I believe one is a blend, and one

3    isn't, but it's the refining process.

4              THE COURT:  It looked to me like (d) has a, quote,

5    "has acceptable odor and flavor characteristic of virgin olive

6    oil."  Whereas (e) is flavorless, and odorless, and it's

7    obtained from virgin olive oils by refining methods -- well,

8    I -- well, no, I don't know, is your stuff flavorless and

9    odorless?

10             MR. SCHOENBERG:  I have not had a chance to try it.

11             THE COURT:  What?

12             MR. SCHOENBERG:  No comment.

13             If you look at subsection(e) in the middle of that

14   paragraph, the sentence starts capital O, Olive oil, olive oil

15   falls within this classification, et cetera, et cetera.  This

16   is olive oil by the USDA's definition.  This is 100 percent

17   pure, quote/unquote "olive oil."  It is different than (d.  I

18   can't -- I am not a scientist, I can't tell you why the USDA

19   has broken the categories between (d) and (e), other than the

20   say the definition is one is a blend.

21             THE COURT:  Let me ask plaintiff's counsel.

22             Has the association taken the position that someone

23   who is selling (e) can't label theirs as olive oil?

24             MR. REDDY:  No, your Honor.  The issue is the word 100

25   percent pure.  And the way that the industry --

```
 1              THE COURT:  So how can refined be pure?
 2              MR. REDDY:  Yeah.
 3              THE COURT:  And you're labeling your stuff as 100
 4    percent pure.
 5              MR. SCHOENBERG:  Yes, but just because something is
 6    refined, doesn't mean it is not pure olive oil.
 7              THE COURT:  Well, I don't know much about olive oil,
 8    but I do know that under the ordinary meaning of the word
 9    "pure" and the ordinary meaning of the word "refined,"
10    something that is refined is not pure.
11              MR. SCHOENBERG:  Well, you can look at the other
12    definitions that fall under the grades of quote/unquote "olive
13    oil," as defined by USDA.  And they are also refined.  (d)
14    US olive oil, US quote/unquote "olive oil" is the oil
15    consisting of a blend of refined olive oil.
16              THE COURT:  Where are you looking at?
17              MR. SCHOENBERG:  Sub (d) 52.1534 as refined --
18              THE COURT:  But that doesn't use the word "virgin."
19    Your -- or "pure," excuse me.
20              MR. SCHOENBERG:  But the association is saying that
21    sub(d) would be fine if we labeled it as 100 percent pure olive
22    oil.  Because it is not refined.  Well sub(d)is refined.  In
23    fact, olive oil is refined.  But the USDA defines the olive
24    oil.  And, again, I'm quoting olive oil as any one of those
25    grades, if it has 100 percent of these grades, it is olive oil.
```

1          THE COURT:  What is crystal clear is that none of

2     these (a),(b), even (c), let alone or (d) or (e), contains

3     pomace, right?

4          MR. SCHOENBERG:  We'll agree.  Yes, that's true.

5          THE COURT:  So let me go back to plaintiff.

6          Your problem with using (e) is the use of the word

7     "pure?"

8          MR. REDDY:  Yes, your Honor.

9          THE COURT:  In connection with (e).

10         MR. REDDY:  Yeah, the prevailing industry standard for

11    the use of the word "pure," is essentially what is codified by

12    USDA as subsection (d).  And that the use of the word "pure"

13    corresponds to blending.  With refined oil with, there is a

14    little bit of --

15         THE COURT:  You would have no problem with their

16    saying as 100 percent olive oil, something that fell within

17    (e).

18         MR. REDDY:  Correct.  The question is the word "pure."

19         THE COURT:  All right, so --

20         MR. SCHOENBERG:  Can I?

21         THE COURT:  -- let me take another stab.

22         MR. SCHOENBERG:  May I be heard a second, your Honor?

23         THE COURT:  Yeah.

24         MR. SCHOENBERG:  I disagree with Mr. Reddy's assertion

25    that that's the industry standard.

 1              If you look at exhibit J,for example, of our motion

 2    papers, you'll see a screen shot from Botticelli, again, not an

 3    association member, where they are describing 100 percent pure

 4    olive oil, as Botticelli 100 pure olive oil is a high quality

 5    blend of virgin refined olive oils.  And if you look at --

 6              MR. REDDY:  Exactly what subsection (d)is.

 7              THE COURT:  So, I mean I -- it looks to me, that -- by

 8    the way, is it important to you to say the word "pure" in your

 9    ads?

10              MR. SCHOENBERG:  Yes.  And I'll tell you why.

11              THE COURT:  And what is it you seek to convey with the

12    word "pure."

13              MR. SCHOENBERG:  That it is nothing but olive oil.

14    It's not extra virgin, it's not virgin, but it's olive oil.  It

15    is not canola oil, not seed oil, not vegetable oil, it's olive

16    oil.

17              THE COURT:  Here's what I'm going to do.  It does

18    sound to me like there is substantial agreement among the

19    parties as to the injunction I propose to issue.  But you can't

20    quite work out a wording, yet, that is agreeable to both sides.

21              So I will give you from now until 2:00 to work out

22    that wording.  And then we'll reconvene at 2:00.

23              If you can't work it out, I'll just do the best I can.

24              But I want to issue -- this is a Friday, I want to get

25    this injunction issued today.  But I'll give you the two things

1   that I am prepared to preliminarily enjoin.

2          It is, basically, any sale of anything that is olive

3   oil that contains pomace, or contains any other substance that

4   is not covered by Section 52.1534; and, second, from selling

5   any product that does contain pomace without labeling it as

6   containing pomace.

7          Those are the only two things I'm prepared to enjoin

8   today.  So see if you can work out the wording among

9   yourselves, and I'll see you all at 2:00.

10          MR. TREANOR:  Thank you, your Honor.

11          MR. SCHOENBERG:  Thank you, your Honor.

12          MR. TREANOR:  If I can raise one additional matter?

13          THE COURT:  Yeah.

14          MR. TREANOR:  And that is the issue of the additional

15   relief we have asked for, injunctive relief which includes -- I

16   understand that your Honor has said that you are not gonna

17   order a recall, but this is issue of notice to the marketplace

18   with regards to the product that is already out there.

19          THE COURT:  I would be -- I agree that's a close call.

20          If there ways a lot of stuff out there, that would be

21   appropriate.  The suggestion is there is not much stuff out

22   there.  And I don't really have much evidence, one way or the

23   other at this point, it's the representations of counsel.  If

24   there is not much stuff out there, then I am concerned about

25   both the expense and the potential injury to the reputation of

1    the defendant by a re-call.  And to be frank, that is partly

2    affected by the use made of the press by the plaintiff in this

3    case.

4            On the other hand, if there is a lot of stuff out

5    there, then it has to be, not re-called, but there has to be

6    notice sent to the retailers.

7            So it really turns on that.  If there is some more

8    information by 2:00 that you can give me, I'm happy to hear it.

9            If you want to take the consent injunction today

10   without prejudice to that on further issue, and then both sides

11   can give me further date on that, we can take that up next

12   week, that's okay, too.  Because I understand the other side

13   really necessarily has firm date on that at this point.  But

14   that's the balance in the Court's mind.

15           If there is a lot out there, then the need for notice

16   becomes sufficient to outweigh the downsides of expense and

17   possible reputational harm.

18           If it is just little stuff out there, then I think it

19   the balance cuts the other way.

20           MR. TREANOR:  Your Honor, I'm not sure we're going to

21   be able to dig up data, certainly not by 2:00.  But, you know,

22   this is 15 percent of the -- most recently, at least,

23   15 percent of the olive oil sold in the United States.  It's

24   typically sold in 101 ounce tins --

25           THE COURT:  Yeah, no, I --

1              MR. TREANOR:  -- and that's --

2              THE COURT:  -- that's a fair point.  And I was not

3    totally -- you know, your adversary says that the real

4    motivation behind this is his company's success.

5              Well, first of all, I don't know want to speculate

6    about people's motives.  But if the success is based on false

7    advertising, then it is a success that shouldn't have been a

8    success.

9              MR. TREANOR:  That's right, your Honor.

10             THE COURT:  So, I --

11             MR. TREANOR:  All we would propose, your Honor -- and

12   I apologize.  All we would propose is notice to the customer --

13   to the best extent that Kangadis can deliver, based on the

14   information it has, notice to its customer that have purchased

15   from it, and request that notice from those customers go to its

16   customers.  Also, notice can be accomplished through --

17             THE COURT:  Notice saying what?

18             MR. TREANOR:  Saying that the olive oil, 100 percent

19   pure olive oil sold by Kangadis contains pomace.  And the

20   product labeled as 100 percent pure olive oil contains pomace.

21             THE COURT:  Well, I think where I come down is --

22             MR. TREANOR:  There is also website notification, your

23   Honor.

24             THE COURT:  I'll take that up at 2:00 as well, but it

25   wouldn't be part of this.  There clearly is going to be a

 1    contest over that.  So I want to get what I hope you both can

 2    consent to, which is what I just read, in the formulation you

 3    will then mutually hopefully come up with.  And that will issue

 4    as a preliminary injunction.  I will consider whatever

 5    arguments either of you want to make on additional consent

 6    injunction.  Additional preliminary injunction, not on consent.

 7    I doubt -- I'm not wedded to consent.  Judges have been known

 8    to make up their own mind.

 9            On the issue of notice.  So I will take that up

10    separately at 2:00.  But I first want to see if we can reach

11    agreement on the portions I outlined a few minutes ago.

12            All right, see you at 2:00.

13            ALL:  Thank you, your Honor.

14            (Recess)

15            THE DEPUTY CLERK:  Please be seated.

16            THE COURT:  All right, so were you able to reach

17    agreement?

18            MR. REDDY:  Unfortunately, we were not, your Honor.

19            The dispute between the parties, as I understand it

20    and Mr. Schoenberg can correct me if I'm wrong, the parties are

21    in agreement on the second prong of the two prongs.

22            On the first prong, the issue comes down to whether

23    subsection(d) and whether subsection(e) is included.

24            It's our position that subsection (e) of the USDA

25    Section 52.134 should not be included, because the prevailing

standard in the industry defines "pure" in a way that requires

the blending of some amount of virgin olive oil into refined

olive oil.

        You can see evidence of this prevailing standard both

on defendant's own website, which defines pure olive oil as a

blend of virgin and refined olive oil.  You can see that also

on the two different suppliers that defendant has pointed to

that now it is purchasing olive oil from.  Those suppliers also

define pure olive oil as a blend of --

        THE COURT:  Well, this is a false advertising case.

And, ultimately, what we're concerned with are the consumers.

I was going use the standards, only because the parties jointly

thought that might be helpful.  But, I must say from the

standpoint of a consumer, I think "pure" normally doesn't have

anything to do with whether it is refined or unrefined.

        If you think about orange juice.  To the average

consumer, I suspect, something that says is 100 percent pure

orange juice means that there is no other substance in there,

that they have not mixed in some other kind of juice or some

water or something like that, so all stuff that comes from an

orange.  And by analogy to this case, it's not stuff that comes

from taking the orange skin and smashing it up, because the

juice you get from squeezing the orange.  But it could be

refined or unrefined.  At least I say this without prejudice to

any evidence that anyone wants to put before me.

D4c0nor2                          Argument

 1              And "virgin," by contrast, suggests that it comes

 2     directly from the olive, I don't think you ever hear the term

 3     virgin orange juice.  But I guess there are no virgins among

 4     oranges.  But so as I understand it, what the defendants are

 5     making is totally refined -- now making is totally refined

 6     olive oil.  And I don't see why that would be within the scope

 7     of what an ordinary consumer would think of when they said

 8     100 percent pure olive oil.

 9              It's clearly not virgin.  And they don't say that in

10     there.  And the whole point of this lawsuit was to get rid of

11     the pomace, and get rid of the passing off pomace as olive oil.

12     And of course the final determination of the word wouldn't be

13     until the end of the case.  But for preliminary injunction

14     purposes, I have already indicated I agree that the plaintiffs

15     have a high likelihood of prevailing on their assertion that

16     pomace is not what the consumer believes is olive oil.

17              So, I'm a little disappointed that what you both

18     thought would be helpful, which is a reference to the USDA, has

19     turned out to be something that's divided you, when I think the

20     parties are substantially in agreement that the preliminary

21     injunction should not prevent these defendants from selling

22     their new product, the product they are now representing they

23     are making in this respect, as 100 percent olive oil.  And,

24     conversely, no one suggests that they should include pomace.

25              So this is a debate over "pure," and the meaning of

1   pure.  And while industry standards may be relevant to that, in

2   a false advertising case it is really what the consumer

3   perceives.  But if we can't get consent, I'll just figure out

4   something on my own.

5          Let me make sure upon.  Am I right that nowhere in any

6   of the standards you have given me, from any source, is the

7   word "pure" defined?

8          MR. REDDY:  That is correct.  I don't believe that the

9   word "pure" is defined in any of the standards.  I did want to

10  respond briefly to your comment that --

11         THE COURT:  Yeah.

12         MR. REDDY:  -- consumers wouldn't think that pure

13  olive oil would include a blend of virgin along with refined.

14         I respectfully disagree, only because refined, purely

15  refined olive oil, has no taste or flavor.  When a consumer

16  purchases olive oil, they are purchasing it because they want

17  the olive oil flavor, they don't want it to taste like corn

18  oil, they don't want it to taste like canola oil, they want it

19  to have a little bit of the olive oil flavor.

20         The only way that flavor comes into the equation, is

21  when you blend it with virgin.  That is what the USDA standards

22  recognizes, and that's why it is important to the consumer.

23         THE COURT:  So their product has no flavor.

24         MR. REDDY:  A refined product would have no flavor.

25         I don't know what the current -- I have not tasted the

1    current product.

2            THE COURT:  All right.

3            Well, their previous product was also -- the one that

4    contained pomace -- was also 100 percent refined; yes?

5            MR. REDDY:  Correct.  Their previous product was --

6    based on their admission, yes, your Honor.

7            THE COURT:  Did that have a flavor?

8            MR. REDDY:  I don't know.

9            THE COURT:  What is striking is that it appears clear

10   that the respective client in this case hired, as their

11   counsel, people who had never actually tasted the olive oil in

12   question.

13           MR. REDDY:  I have tasted it, your Honor.  I -- I am

14   not an olive oil expert.  I know that the product had --

15           THE COURT:  This has nothing do with experts, right,

16   it has to do with the average consumer.

17           MR. REDDY:  No, understood, your Honor.  And actually

18   I --

19           THE COURT:  You look like an average consumer.

20           MR. REDDY:  And actually, your Honor, I misspoke when

21   I said that the previous product had no flavor.  Actually, when

22   it was sent for testing, along with the testing that was done

23   for chemical testing, an organoleptic assessment was done,

24   which is a sensory analysis.  What one would have assumed from

25   a pure refined product, is that it would have come back with no

D4c0nor2                        Argument

flavor, whatsoever.  In fact, this came back with a flavor of

lampante, which is a bad flavor, to put it in laymen's terms.

          If you looked in the category that the USDA talks

about, it's that's stuff that cannot be fit for human

consumption.  L-A-M-P-A-N-T-E.

          And that that's what the test results from the

laboratory suggested.  So I don't know how to square that with

their statement that they have used a purely refined product.

          That those are the facts that we have, your Honor.

          THE COURT:  Let me hear from your adversary.

          Thank you.

          MR. SCHOENBERG:  First, I'd say that the Conte report

is hearsay.  We have not had a chance to depose Professor

Conte.  I am not sure which reference Mr. Reddy is making to in

the report, but to rely on it at this point, I don't think you

can.  Lampante --

          THE COURT:  Did you bring a bottle here of olive oil?

          MR. SCHOENBERG:  Funny you should ask, I do.

          THE COURT:  All right, I'll taste it.

          MR. SCHOENBERG:  But it's empty.

          Lampante is that (c) grade of olive oil not fit for

human consumption, which we're not saying should be excluded,

should be excluded.

          I have spoken to Mr. Kangadis, who absolutely has

tasted all of these products.  And he assures me that

D4c0nor2                          Argument

 1   Capatriti, when it had pomace oil, has no flavor.  Again, the
 2   only reason that you add any sort of virgin olive oil to
 3   refined is to add the flavor.  But the point is that refined
 4   olive oil is still pure olive oil.  And if you were to make it
 5   US olive oil, by these standards, we could add point zero zero
 6   one percent of virgin olive oil and, boom, we have US olive
 7   oil.  It is an illogical argument.
 8            THE COURT:  No.  No, the question is, I agree with you
 9   that these standards may not be helpful, that's -- you know,
10   you jointly suggest that we use these standards.  And it's
11   creating more problems than it may be solving.  But the
12   question is what is meant by the term "pure."  And if what is
13   meant by the term pure to the average consumer is unrefined,
14   then that's one thing.  If what is meant to the average
15   consumer is that it doesn't contain anything else but olive
16   oil, it's another thing.  I was suggesting that at least in the
17   context of orange juice, the average consumer thinks of "pure"
18   as simply that it is just orange juice, it doesn't contain
19   anything else, which is essentially your position, if I
20   understand it in terms of the olive oil.  But I don't have any
21   evidence, one way or the other, and none of the standards
22   address pure, and it was not the subject of any briefing.
23            So I think we have to go a different route than using
24   USDA standards, since they don't translate into that.
25            MR. SCHOENBERG:  But I guess the point that I was

D4c0nor2                          Argument

1      trying to make in bringing up the standards, is that we could

2      do what your Honor had suggested, that does not contain any

3      pomace or any -- and we can modify the language to be any

4      substance, instead of "not covered by" you do it affirmatively,

5      "substance covered by Section 1535" which describes all of the

6      grades of pomace oil.  You make it --

7             THE COURT:  Yeah, but that's a -- and that still

8      doesn't resolve the debate.  It's (e)that that the plaintiff

9      says you should not be within the equation, so to speak, and

10     which you say should be in the equation.

11            MR. SCHOENBERG:  Correct.

12            THE COURT:  And that turns, everyone agrees, that (e)

13     like (a),(b), and for that matter even (c), and(d), is

14     100 percent olive oil.  The debate is whether it is -- whether

15     (e) is pure olive oil, is it 100 percent pure olive oil.  And

16     nothing you can given me really resolves that.  So I think we

17     have at least agreement on this much, that the defendant is

18     preliminarily enjoined from selling, as 100 percent pure olive

19     oil, any product containing pomace.  And, from selling any

20     product containing pomace without expressly labeling it as

21     such.  Right, do we have agreement on that?

22            MR. SCHOENBERG:  Yes, your Honor.

23            MR. TREANOR:  Yes, your Honor.

24            THE COURT:  So let's do this.  I will issue, right

25     now -- as soon as my law clerk can re-type it -- on consent,

D4c0nor2                          Argument

1    just that limited -- and then I will take up in my chambers

2    over the weekend all of the other things that you have all

3    discussed that you cannot reach consent on.  And I'll issue a

4    further order, which may either be more preliminary injunction

5    or a lack thereof, but some sort of order, early next week.

6          I don't see any reason why this world will come to an

7    end, between now and the beginning of next week, especially

8    given that this order will take effect immediately.

9          So the order that takes effect immediately is, I'll

10   just read it here aloud, and then we'll file it later today.

11         On consent of the parties, defendant is hereby

12   preliminarily enjoined (1) from selling, as 100 percent pure

13   olive oil, any product containing pomace; and (2) selling any

14   product containing pomace without expressly labeling it as

15   such.

16         And I'll take up all of the other points, including

17   the notice point and the re-call point, and everything else, in

18   the order that I will issue early next week.

19         Okay, anything further we need to take up today?

20         MR. TREANOR:  Your Honor, earlier when we met, I said

21   that I didn't think we would be able to come up with any useful

22   statistics by 2:00.  We do have some useful information we

23   think would be helpful to the Court.  And that is that

24   research, market research has shown that Americans consume

25   approximately 1 liter of olive oil per year.  That's a lot less

D4c0nor2                          Argument

1    than the 24 liters consumed in Greece, which is the highest,

2    and there are other countries that are lower.

3              THE COURT:  Is that why the Greek economy is in such

4    trouble?

5              MR. TREANOR:  Perhaps.  Perhaps, your Honor.

6              THE COURT:  So the 1 liter, these are sold in 3-liter

7    tins.  Obviously, if you are someone who lives alone, you

8    probably are less likely to buy a 3-liter continue, than a

9    family.  But I think it's safe to say that a 3-liter tin could

10   typically last up to a year.

11             We would also note that on the samples provided by Mr.

12   Schoenberg of the new tins, the sell-by date is a two-year

13   period of time.

14             So to the extent that the Capatriti 100 percent pure

15   olive oil is viable on the marketplace for two years, that

16   means that the containers could be out there.  And, obviously,

17   there will be more sold sooner, rather than later, in that time

18   period, but it's market viable for two years, probably takes

19   somewhere --

20             THE COURT:  So I see where you are going, let me ask

21   you a related question; two related questions.

22             First, rather than my issuing this subsequent order

23   early next week, maybe we should give an opportunity to both

24   sides to, early next week, make any further submissions on the

25   issue of what is already out there that, arguably, needs to be

D4c0nor2                          Argument

1    re-called or, short of that, notified about.

2            So why don't we say any submissions on that, and not

3    to exceed 10 pages, 10 double-spaced pages per side, should be

4    submitted to the Court with any attachments that need to be

5    should be submitted to the Court by 5:00 Wednesday,

6    simultaneously, both sides.  And I'll hold off issuing my order

7    until the end of the week.

8            With respect to that, though, assuming for the sake of

9    argument you convince me that there is a lot out there, then --

10   I was not going to impose any bond on the consent injunction

11   that I just read, because I don't -- first of all, it's on

12   consent.  And secondly, there is no real costs involved.

13           A notice and/or re-call do involve real costs which,

14   if you then fail to prevail, ultimately, your adversary might

15   be entitled to recoup.

16           Is a bond appropriate for those purposes?

17           MR. TREANOR:  Well, your Honor, our position is that

18   it's not.  And for the reason that your Honor has observed with

19   regards to the issue before you on the preliminary injunction.

20   And that is that pomace is not olive oil.  We think the

21   likelihood of succeeding on on establishing that is extremely

22   high, that there is no costs involved in --

23           THE COURT:  All right, I remember reading that in the

24   New York Times, your view on that.

25           Well, the point is that I don't know about extremely,

1    but obviously I agree with you that the likelihood is very

2    high, that is why we went down the road we did this morning.

3    But, that doesn't mean it's impossible that your adversary will

4    prevail.  And that's what bonds are all about, are they not?

5              Now, let me ask a different question, what's the

6    assets of the plaintiff?

7              MR. TREANOR:  Your Honor, the budget of the

8    association is established, is funded through membership dues.

9    I'm not going to represent that there are no assets of the

10   organization other than the dues that flows in to cover the

11   expenses.  I suspect that's the case, but we'll submit

12   something to the Court --

13             THE COURT:  Here's what I'm getting at.  We don't need

14   a bond in a situation where the party requesting injunction is,

15   you know, an established institution that's always going to be

16   good for any damages that might occur.  That's not the sole

17   reason for a bond, but it is a relevant consideration.

18             How long has the association been around?

19             MR. TREANOR:  1989.

20             THE COURT:  And how many members?

21             MR. TREANOR:  Approximately 75 companies, right now.

22             THE COURT:  All right.  Well, I will think about all

23   of that.  If either, or both of you, want to, in your 10-page

24   submission, also say a word or two about the bond.

25             My only point is this.  For the present injunction, no

D4c0nor2                          Argument

1   bond is necessary under any analysis.  If, for example -- I was

2   thinking about the notice.  The notice without the re-call

3   somewhat puts the retailer in an odd position.  What are they

4   gonna do, put up their own signs that says this really contains

5   pomace?  Or, are they just going to send it back to the

6   company.  So that puts -- it's an odd kind of thing.  And maybe

7   we should give them some guidance in that -- if the guidance we

8   gave them, taking at worst case for the defense at the moment

9   was re-call, and then the Court were to determine, or the Court

10  of Appeals were to determine, for example, because an

11  injunction would be immediately appealed, that re-call was

12  inappropriate, that would be potentially substantial damages

13  that a bond ought to cover.

14          But if the company, if the association is good for it,

15  so to speak, under any fair analysis, then maybe it's really

16  not necessary.

17          So you may want to address that in your papers.

18          THE COURT:  Okay.  All right, anything else we need

19  take up today?

20          MR. TREANOR:  Not from the plaintiff.

21          MR. SCHOENBERG:  No, your Honor.

22          THE COURT:  Thanks so much.

23          (Adjourned)

24

25